Good afternoon, Illinois Appellate Court, 1st District Court is now in session, the 5th Division, case number 2-0-0-5-4-6, City of Country Club Hills v. Derek Charles. Thank you, Mr. Schaffer, and welcome to the Appellate Court, 1st District. We appreciate your accommodating us by having the arguments on Zoom today. We first want to verify who's going to argue on behalf of the two sides. Mr. Murphy, are you going to argue for the city? Yes, Your Honor. And who's arguing for the police officer? Your Honor, Ivan Rittenberg, I'd like to argue the facts and allow my learned colleague, Mr. Moran, to discuss the law. All right, we're going to depend on the two of you to split your time. We allot about 15 minutes per side. We tend to always have a lot of questions in this division. So, Mr. Rittenberg, when you hit about 7 or 8 minutes, you may want to trail off and pass the baton over to Mr. Moran if you're going to go in that order, all right? Yes, Your Honor. And then we will reserve 5 minutes at the end of additional time for Mr. Murphy to reply. All right? Mr. Murphy, you may proceed when ready. I'm ready. Mr. Murphy, may it please the court and opposing counsel, thank you for allowing us to orally argue. I hope our briefs made it clear that we recognize the limitations and the general rule regarding review of arbitration decisions. We are invoking the public policy exception in this case because we have what we consider to be unimpeachable objective evidence demonstrating police officer dishonesty. And this is not simply dishonesty by a clerical employee or somebody not involved in law enforcement. The evidence shows police officer dishonesty. And that, in our view, is something that public policy demands that the officer not remain in employment. Let me talk briefly about each incident. The court's read the brief, so we have two incidents. The first incident is what we call the club or the club 183 incident where Officer Charles was called in on overtime to go to provide additional security late at night between 1 and 2 in the morning at a bar where there was problems. Now, your honors, this were simply a case where the arbitrator says, I believe Mrs. Smith and I disbelieve Mr. Jones. That's the end of the case. We would not be here. But we have unimpeachable evidence, the functional equivalent of video evidence in the form of the GPS, undisputed, unchallenged by the union in the case, which shows us that during the hour in question, from 114 a.m. Mr. Murphy, I have a question. You said the officer was called in for overtime. Wasn't he that that was his regular shift, but he had volunteered to work overtime for covering this club 183 or whatever it was called, isn't that? That's correct. It was it was a overtime assignment specifically earmarked because of the need for additional manpower there. But he was working his regular shift and then the additional time was going to be overtime for covering the club. Is that it? No, it was actually a full overtime shift for him. OK, so he was they asked for volunteers and he he volunteered for that shift. But the reason for the overtime was the need to provide the additional security at the bar. Mr. Murphy, you know, I think we're used to police departments and how they give general orders and they love to put things in writing. And what we have here is, you know, taking the testimony at its best for the city. We have the the watch commander saying we have the fellows, we have the club tonight. Why isn't that sufficiently vague to justify the relief you're seeking? That conflict is something that, as I mentioned at the outset, your honor, is appropriately reserved to the arbitrator. But the focus of the dishonesty in this case was first during the course of the interrogation. So we can put aside the vagaries of the of the lack of a specific articulated general order. What this boils down to is during the course of the interrogation. I said to him, I conducted the interrogation and I said to Officer Charles, what were you doing for that? And he said during the course of the interrogation. At C-775, I was either there during traffic, doing traffic enforcement, reading reports or typing a report. We know from the GPS that the engine was off. And he was behind the band in the McAllister Nursing Home on 183rd was behind that. He then admitted during the course of his interrogation testimony that he wasn't doing any of those things. He wasn't doing traffic. Of course, you can't do traffic when the engine's not running. He admitted he wasn't reading reports. He wasn't typing reports. What he was doing was nothing. So, Justice DeLorte, for purposes of my argument, the court can put aside the fact that there's ambiguity regarding the general order and a conflict in testimony as to where as to whether Charles should have been at the bar at that time. Point is, he was asked specific questions during the course of the interrogation. The GPS, the functional equivalent of video, put the lie to that explanation. And then he admitted during the course of the arbitration testimony that everything he said during the interrogation was not honest. Is there anything in the record that reveals what he actually was doing with the car off in the nursing home parking lot? There's nothing in the record. All that's in the record was that there was zero activity. Engine off. When the engine's off, you're out of touch with other vehicles. That's not true. There's no testimony. Mr. Murphy, I had another question for you. I couldn't see if I saw it in the brief. How long after this, this occurred, did your investigation and interrogation take place? It was within a few months. Okay. The GPS, you put a lot of weight on that. The GPS tells us where he was and that the engine was off. And how much more can we take from the GPS evidence? Well, you take from the GPS evidence that when a police officer who was on duty has the engine off and doesn't move for an hour while on duty, that he wasn't doing anything. You combine that with the admissions that he wasn't doing traffic enforcement, impossible to do traffic enforcement with the engine off. That's not true. Let me ask counsel for the officer in an appellate argument, we don't interrupt each other. You have your spot of time and we'd ask you to respond during that period of time and not interrupt each other. All right. Thank you. I have another question. I assume that police officers from time to time sit in their cars with the engine off at various locations, waiting for people to go by or whatever it is that police officers do. The reason that I asked you about how much time had elapsed between when this occurred and when you interrogated him is because, I mean, this would be something that a police officer does every single day, I assume. And if it's a few months later, was there anything that pointed to that particular day? How do you know which day you were talking about when you were interrogating him? Because I would imagine if they have ladies night at the club on Thursdays, it could have been any Thursday, right? Well, the GPS identified the particular date, so we know that. Well, you knew it, but did he know it? We identified during the course of the interrogation. We told him that there was GPS evidence showing that he wasn't doing anything. On a Thursday night a few months before. That is correct, except that in the interrogation, Your Honor, if the arbitration were the first occasion where we asked him about what were you doing a year ago, the answers I don't remember would have weight. But when somebody specifically says I was doing X, Y and Z, those are specific assertions that that person made and those assertions were not honest. Mr. Murphy, let me move over to the other incident involving the prisoner. There are a lot of references in the record to a video. Was the video presented to the circuit court? And it doesn't appear that we have the video in our record. The clerk asked that. I do not believe the video was made part of the circuit court record. Of course, it was played at the arbitration, as you can tell from the transcript. And as far as that, that's the one we call the Barfield incident. This is the one where the officer was asked to provide a detailed report concerning what happened. And we know what happened from the video is that the officer left the booking room door open and when he was asked to provide a detailed report, he didn't own up to the fact that it was his fault that he left the booking room door open. And Justice Cunningham, in the Barfield incident, when we did the interrogation, this follows up your question regarding memory, routine incidents and the like. During the course of the interrogation, he was specifically asked, and this is at C-500, about any potential memory loss. And the question was, question, well, did you forget about it? Did you forget about that you left the door open when you made the report? Answer, no, sir. So that means that the officer did not forget the fact that the reason the prisoner escaped was his fault and therefore his omission of the most critical detail of all when asked by the boss to say what happened is, in our view, dishonesty by a police officer. And dishonesty, when a police officer is either under oath, as he was in this case, or being ordered by his boss to answer questions put to him fully, completely, and honestly, is a matter of significance. I'm sorry, go ahead and finish your thought. No, no, I was just going to turn to public policy. So go ahead, Your Honor. Before you do that, let me, it appears the Barfield incident was a family dispute. It wasn't that the Mr. Barfield just sort of went to a stranger and stole their car. This was the grandmother's car. And the record strongly hints, if it doesn't actually state, that he was going to be released anyway out of the police station. Some sort of bond issued at the station. Does that fact that he wasn't going to be a prisoner transported to a jail or kept in custody, doesn't that support the arbitrator's decision not to grant a more severe penalty? No, for two reasons. I don't believe we got to the point of the underlying violation because of the escape and the assault of the police officer. Secondly, Your Honor, you may be leading to a point that the incident itself, the incident itself, may have not justified anything more than the imposition of minor discipline. But that turns to what I may call the Watergate problem. It's not the break-in, it's the lying about the break-in which furnishes the problem. In the case of a police officer, it's not erring, it's not making a mistake, it's not making a rookie error in judgment or miscalculating the seriousness of this matter in the booking room. The part that we cannot tolerate is the part where the officer doesn't fess up and say, you know what, I screwed up, I let that door open, and I should take my punishment for that. So it's the honesty factor, Your Honor, at all. Our whole argument pivots back to the question of police officer honesty. And we certainly have seen both sides discuss at great length the case law in Illinois that points in the direction that we do have a public policy that police officers are supposed to be scrupulously honest. The question before us is slightly different, which is, if the police officer is not honest, does that automatically mean that termination is the remedy, or is there a possibility that a lesser remedy could apply, and isn't it the arbitrator's purview to determine what that is? Let me first answer what I believe is the absolute value. If a police officer is not honest under circumstances where he is ordered to be honest, or where society demands that he be honest, swearing out a criminal complaint, answering an interrogation question under oath, testifying in an arbitration under oath, those are circumstances that our argument is there is no room for anything other than removal of that person from employment. Police officers are society's witnesses. Now more than ever, in terms of police accountability, we need, and I am urging on behalf of the city, something of an absolutist rule that under those circumstances, if a police officer is dishonest, public policy demands removal of that officer. This is an unusual coincidence, and I hope I'm not playing up to one of the justices here, but about an hour ago, I did that last minute check of case law and everything, and I came across an opinion from about three months ago. It's a Cook County Merit Board case, and the author was Justice Cunningham, and the case is called Rios versus the Merit Board. One sentence from your Honor's opinion is what I would like to leave my opening argument with. And that one line is, quote, the job of a police officer requires the utmost integrity and honesty, close quote. The position of the city of Pantry Club Hills in this case is that when an arbitrator orders the return to work of a police officer who, based on the underlying objective unimpeachable evidence I've discussed, demonstrably lacks those quality. That decision would violate public policy and demand that the officer be terminated, as opposed, Your Honor, Justice Lord, to cases where an officer makes a really bad mistake or even intentional misconduct. And some of the cases say what we have to evaluate is the likelihood of whether that misconduct will be repeated. There was a case, a public policy case out of Des Plaines where that was discussed, and that would apply to, I think, a wide range of police misconduct. But in my view, respectfully, not to police officer honesty under circumstances where the officer is obligated to the employer and to society, to be honest. Thank you. Does the panel have any other questions? No questions. Mr. Murphy, in accepting the public policy aspect that our police officers must have the utmost honesty, do we have to invade the purview of the arbitrator to make a finding that Officer Charles was dishonest? Yes, Your Honor, if I can have one minute to answer that question, because it kind of goes to what I've called my Scott versus Harris argument. If this were just the case of credibility between witnesses, that would be an inappropriate invasion of the arbitrator's domain because we bargained for that decision by the arbitrator. But as I mentioned in our briefs, the Supreme Court decided that case Scott versus Harris, which if plaintiff says something on summary judgment that's contradicted by video, we don't defer to plaintiff. The court is bound by the video. What I am arguing in this case is that the video evidence that's undisputed in Barfield and the GPS evidence in the 183 incident, both of which point in one direction and one direction only, police officer dishonesty in that very limited circumstance. Public policy allows this court not to be bound by the contrary findings of the arbitrator. All right. Thank you, Mr. Rittenberg. You're going to split the time. We'll give you about eight minutes plus. If we ask you a question that you'd prefer, Mr. Moranfield, just let us know that and we'll park it until he gets his chance at the microphone. All right. Mr. Rittenberg, you may proceed when ready. I first would like to apologize. I forgot in this COVID world that I was on the audio. You know, I'm thinking to myself out loud in my office and it was unconscious that I would interrupt my colleague, Mr. Murphy, and I apologize to the court, but this is a new world for all of us. But to address what's before you, make it clear. They're asking this appellate panel to declare this man a corrupt police officer, a dishonest police officer, and the facts aren't there. In fact, you know, we'll start with the Barfield thing. Their video is a video of an open door. Our officer was ordered to leave a report about what happened. He is an officer. We are officers of the court. The Supreme Court rules of the public procedure says that we're supposed to provide every fact necessary for the understanding of the appellate court to understand the case and review it without flavoring. Okay. I had to file a supplemental statement of fact. I'm not inferring that Mr. Murphy was dishonest because his view of answering the appellate rule and my view is different. That's exactly what the arbitrator said. He says he understood it to be a logical what happened and more salient since the issue was to enter an honesty, Charles, Officer Charles, a black officer with 10 years experience, never denied that the door was open. In fact, it's in the record he expected to be disciplined for a door open, but he and normal police procedure, which the arbitrator would be aware of doing these cases, is that if they were dissatisfied with his report or answers, they would supplement it and ask him a direct question. So what they're trying to do is in the absence of a stating of fact, they want to infer dishonesty or see enter. Well, if that was the case, then all of our licenses would be up in the air every time we write a brief. Mr. Rittenberg, I have a question for you. Did you did at any time in addition to asking Officer Charles to state what happened, was there any specific direction regarding, you know, asking him other than saying, tell us what happened, which he seemed to have left out two of the most important facts. Was there any further direction as to how that narrative was expected to be read to be laid out? No, Your Honor. No, Justice. Just give me a detailed report of what happened. And in his mind, he did, and the video is in no way can determine see enter or dishonesty, because he never denies what the video shows. So that's gone. In my mind anyway, it's going to be your mind that counts. You're asking you're saying that they're inferring dishonesty from the fact that he left something out. But isn't the opposite also true. He's a police officer, and if a person who's detained escapes because a, the door is open when there was a rule requiring the door to be kept locked all times that a prisoners in that room or in the TV is in the room, wouldn't that be a fact that an experienced police officer would necessarily include and if he doesn't you can infer that it was an intentional omission. I mean, that's what that's what your opponent is saying. I mean, that's what I understand him to be saying maybe I'm incorrect, but that's what I understand. What do you respond, how do you respond to that? I can respond that as 28 years as a policeman myself of honorable service, rising assistant deputy superintendent of police under Leroy Martin. I would not infer my officer was lying, simply because that fact was admitted I'd asked him a question on it. If he wants to lie, give him the opportunity to lie. I don't end a person's career and future and brand him a corrupt cop on an inference from fact that he didn't state any more than I would ask Mr. Murphy's license to be surrendered, because he didn't make a statement of fact that I thought was necessary I can't get into these people's minds, but I do have a duty to be fair. So, Mr. You know, here we are, years later and we've never seen a single report that he wrote, and he eventually admitted that writing the reports. So, the city is arguing that you put all this together and it's enough to say he violated his oath of honesty and therefore warrants termination under public policy. What about, what about that. Well, first of all, if one would look at the record, it misstates the record and mistakes, testimonial officer Charles. First of all, they accused him of not answering radio calls that's in the twins C 746 and C 747 track charges, which gives you a tenor what the city's cases like. In fact, they couldn't produce a call that he failed to receive or respond to, and there was no order to go to the club, and there was no. The only thing he did respond to is one of the most dangerous calls a policeman could have and it wasn't even his. The next beat over had a domestic with a gun. He took that in what does that tell me. That means he's a great policeman the one I want on my department, the one I want backing up me. That says something about his character right there. More policemen are killed in domestic disputes with guns than any other call. That's what time was the domestic dispute, it was earlier than the one he was supposed to be at the club but it's in the record that went down. Now, he never received a call and never go ahead and order to go to 183 club he testifies that he was at the Hannah club, which is at 183rd right where he was. Now, Mr. Murphy's a pretty good lawyer. During the interrogation if I was there things would have gone a little bit different. He says to him, Mr. Murphy at C 775. Again, accepting my representation that based on the GPS, and the pinpointing of your vehicle was parked north of 183rd Street. If I was there, I would say objection assumes a fact not in the record. And in fact, the record disproves that it's not a fact. But what what is Mr. Charles Mr. Charles as a policeman who follows orders, and Mr. Murphy is a person of power and respect. So, he answers yes, that's an ambiguous answer at best. He doesn't say that he was north there he says yes so he assumes it. Then the next question and you have to look at what's actually in the record. Murphy says in that area of the old McAllister nursing home. Do you have any explanation for that. Again, he's told to assume that he's there, and he's following his orders, but he doesn't say he was there. He says, again, I was either now this is an alternative either doing traffic enforcement reading reports or typing reports, he doesn't say what he was doing. He said this is this is weeks later. Now, let's, let's go on to what's actually in the record. Donald Washington their IT administrator testified that on August 25 2017 the GPS showed that he was in in 50 feet of 183rd Laverne. It doesn't say there's not a word, except in Mr. Murphy's question about a nursing home, nobody testifies that he's behind the nursing home, doing nothing. Okay, this is a Thursday night in a small village. There are no calls. I don't know what a policeman's job isn't to manufacture crime. And of course they sit at an intersection. He says he's at a club which is like that 183 club, but there's nothing going on there's no drunks coming out. He says he's doing, he could have been doing traffic enforcement. Well, I don't know why you can't turn off your engine to do traffic enforcement traffic enforcement, as you know, is very much like fishing. You sit at a location. And if somebody goes through the traffic light over there at 183rd, you turn your car on to put your light sign to write the ticket. Those are all running out of our share of the time. You're running out of your time. Okay, well, so what he says are undisputable facts aren't undisputable facts. The very fact is that the GPS does not put them behind the nursing home, the very fact if you look at the questions they actual answers. He was not lying and the arbitrator actually finds that he also finds that you cannot convict somebody on innuendo and charges. Just where is the nursing home who puts them at a nursing home. And why couldn't he be doing traffic enforcement, several months later when he answers I'm doing, he's at 183rd and Laverne, there is a traffic light there. I'm done with my time if you have any questions so far. Any other questions for Mr Rittenberg from the panel. No questions for Mr Rittenberg. Thank you. All right, Mr. Moran, it's back over to you. Thank you guys. I'll just take a few moments. I think that first of all the law is overwhelmingly clear that what the city of country club hills is trying to do here is get a court to reverse an arbitrator who's never been accused of fraud, taking a payoff. The, they disagree with the decision that the arbitrator made, and that decision, unless they produce overwhelming evidence has to be upheld. The city tries to get around this by pointing to a recent United States Supreme Court decision which involved, and has been limited to its express facts, which is, which consists of squad car, going at a high rate of speed and chasing someone and being a very serious automobile accident cases. There's three Illinois cases from the unreported cases from the Illinois Teleport. None of which adopt the reason of that case, because they all distinguish it. That case that requires Moran, Mr Moran, what about the public policy argument here in Illinois, I mean I think we all read in Illinois, the policy is that police officers must be absolutely honest. You know you can't lie by omission or intentionally or otherwise you have to be absolutely honest and above reproach for all of the reasons that the various cases state what about that here, and justice the Lord, the Lord's prior comment about the mosaic it wasn't one thing but all of these little things first he left out something that you can expect an experienced police officer to have included in a report, when asked to explain what happened, then the question of what he was doing. Albeit that this occurred some months later, which is why I asked the question. But what about all of these, the, the mosaic that's created is not one of honesty and how does that dovetail with our public policy in this state, the police officer must be absolutely honest. Can you respond to that please, because I think that's what this case. Yeah, I can respond to it. First of all, when one is asked unclear questions, questions that cause call for the testifying individual to guess as to what the questioner is asking for. I think that you are going to elicit responses that are somewhat ambiguous and when the questions are ambiguous. You get ambiguous answers, the state. I think you mentioned the time that elapsed the village or the city had no problem allowing this gentleman Mr Charles to work for three or four months after this incident. And the record shows that they only start to terminate him. When he had some sort of a dispute with the chief. I don't, I don't recall from the record what that was. I do think that Mr Charles answered the questions. Honestly, if there was a question as to He did not produce certain information. At that time, I think that there should have been a follow up question by the city attorney, Mr. Murphy. I don't think that one is required to guess as to what his or her omission, the consequence of an omission is. And in this particular case, we're not talking about something that's easily Demonstrated by a video or demonstrated by by actions. What we do have is a list of actions that that Aren't in the record. For example, as Mr Rittenberg pointed out, the There was testimony that officer Charles was supposed to be at a nightclub with other officers, according to an officer Pittman but officer Pittman was never called and no one no one supplied the missing ingredient that that's what he did that he failed to to do something at that club. The GPS is vague because the he Mr. Charles or officer Charles wasn't asked any specific to that. Where were you actually And I think that part of that is understandable because of the fact that, and I think the arbitrator noted this as well that three months or more had gone by and officer Charles is continuing on the police department and operating as a police officer. He wasn't suspended that night. And as your honor got to that point, I mean, Officers see dozens of incidents every day. So he's trying to recall back without a very complete question or a very complete Statement of what the circumstances are and trying to answer questions. The focus of the interview initially was the boy who took his grandmother's car. And and that fell apart when it was pointed out that leaving a lock up In a holding room are different items, different things. As far as a duty to give out Greater information. I don't, I don't see any pernicious impact from Officer Charles not remembering exactly what he was doing. He remembered he was doing traffic, but he didn't remember whether he was writing Reports or writing this or that. It's been three months. I don't think any of us could remember exactly unless there was some striking thing, but there wasn't. He wasn't suspended that night. He wasn't given a clue that he would he should start considering everything he did that night. Months go by and then all of a sudden he's dragged in on on a charge on these charges. So I, I don't think it. I think he met his duty of honesty in this particular case. I don't commend him for it, but the arbitrator heard everything and and saw the testimony and judge the credibility of the witnesses, which is what the collective bargaining agreement and our understanding of arbitrations requires And it is not for this court or for any of us to put our judgment in Mr. Murphy thinks that this is a violation of public policy. The Scott versus Jacobs case. Doesn't deal with public policy. It deals with an event. It deals with whether or not officers violated the Fourth Amendment in a vehicle chase No Illinois case has advanced the Scott theory has adopted it. They've distinguished it away just as the Seventh Circuit has and I can provide those cases if if you need them. But I don't think that anything occurred here that impugned Officer Charles's credibility. Again, just the sheer amount of time that is elapsed to say what you were doing as a police officer late at night. I just don't see how one would remember exactly what documents, you were filling out and I don't know what the discovery process was here or anything else but I don't see why Officer Charles should have known that they wanted to know that someone would be judging exactly what he was writing when that was never presented at the hearing. So that's, that's, that's, that's as much as I can say about the honesty of the officer. I don't think You know, if the question gets down to nuances how forthcoming a police officer should be Well, I guess, you know, in the criminal context, you know, we, we, we look and see whether or not there's something there that's a material omission. These, these omissions. That are claimed by the city couldn't have been very material because they waited three months before they even decided to charge a violation. And They certainly wouldn't be material in the sense that we see in in criminal cases, we wouldn't be seeking to reverse convictions, based on on whether or not Officer Charles was writing an arrest report or a speeding ticket. So I, I think that he was As honest as the questions required him to be. And I think that the question of follow up was really for the questioner, not for the person being questioned. And I think that given the high burden. Mr Moran, I have a question. Aren't you kind of aren't you playing with semantics here saying he was as honest as the question required him to be. What does that mean It means that that Mr. Murphy could have asked him further questions and didn't means that it means that he could have been shown documents and and and asked to explain them. And that's, that's, that's all that I'm meaning about that. I'm not trying to Create a new new standard of Honesty, but I do think that As Mr. Rittenberg pointed out, some of those questions should have been followed up if he thought that the answers were vague or were omitting salient details and Given the way the questions were phrased. I don't think any salient details were besides what he answered were required. That's really all I'm saying. I don't think that, you know, The questions didn't, he wasn't asked to give, nor did anyone expect him to give a mea culpa, mea culpa, mea culpa in this line of question. I think that he And Mr. Moran, you're, you're, you've run out of time. So I asked you to bring your comments to a close. I just think judges of the court that Both the, you know, you judge the arbitrator's decision in that case. And based on what the arbitrator saw and heard that you should affirm the arbitration decision that there's been no public policy violation here. Thank you. Any other questions from the panel for Mr. Moran? All right, Mr. Murphy, you've got five minutes for a reply, but let me, let me start you out with a housekeeping question. The city sued both Mr. Charles and the original union and then it looks like along the way. A new union was certified for the police officers in Country Club Hills. And then there's a very strange order in the record. Releasing the second union from liability, but not dismissing them as a party. So as we sit here today, just for our housekeeping. Is the union still a party or either union a party or I don't believe the union is a party. The paper may be flawed. Your Honor, let me back up when the case was heard the Teamsters had Country Club Hills police. In the interim between the case and the lawsuit Teamsters was voted out by the union called ICOPS. And then for whatever reason, Mr. Charles chose to be represented by my colleagues. So ICOPS dropped out and I think they were looking for a release in terms of, you know, the normal duty of fair representation and the like. But whether the paper reflects it or not, ICOPS is out of play in the case. All right. Thank you. In reply, I'd like to make three or four- Excuse me, Mr. Murphy. I'd like to kind of guess the question. I kind of see this type of case as different than administrative review. You know, in that a decision on what kind of punishment is given, we can distinguish based on facts and other different factors and evidence. Justice Delora has painted this and Justice Coneyham talked about that too, that there is a mosaic involved here. But tell me what you think would be the future of these types of cases if we were to accept your arguments and reverse finding that there was a violation of public policy. Will that require that every time there's an omission or any type of defense that something less than termination will not apply? Thank you for that question because it is, although I represent nothing but local government, it is certainly not my intention to open the door to turning arbitrations into administrative review. This would only come if, Your Honor, assume everything the same, except it's a public works employee. Not the function, not the function of the court to second guess the arbitrator's decision. Assume everything except no GPS and no video. Not the function of this court to interfere with the arbitrator's decision, which we bargained for. But here we have a unique set of circumstances dealing with undisputed evidence, photographic evidence. Like I said in the reply brief, a video of somebody in a uniform breaking into an ATM, but the arbitrator says, well, I believe the officer, he wasn't there. A narrow exception based on this unimpeachable evidence going to police officer honesty. We have a coincidence of timing here where this particular public policy is elevated to about the most important policy we have going now in the last six months. A decision that I urge, narrow as it is, limited to police officers, limited to police officer honesty under circumstances that we're going to see more and more. Why? Because of body cams, because of the prevalence of dash cams. There's going to be this sort of objective evidence that a court and an arbitrator is going to be able to review as if you were there. So this is on the cusp of where we're going. And one of the things I would ask the court to consider that a ruling upholding this issue of absolute police officer honesty would be welcomed by arbitrators. I know that some on the panel dealt with arbitrators and they don't have any standard other than that phrase just cause in the collective bargaining agreement. Arbitrators want appropriate judicial guidance. And I believe that police officer honesty is an absolute value that we have to rigorously enforce. And arbitrators will want that, police departments will want that, and the good cops will want that. And if I could turn to the first question. No, but what's your answer? You didn't answer the question. The answer is I'm asking only for not an invasion of the province of the arbitrator, but a recognition that there is no dispute when the objective evidence contradicts a finding of fact. Well, let me ask the question again, the way I interpreted what Justice Rochford asked. Are you saying that when it comes to, well, this is my own question, when it comes to police officers, there is never a time when something other, a punishment other than termination will be acceptable or appropriate. If there is a question of honesty, regardless of what the level of dishonesty is, there's never going to be a situation where something other, some punishment or sanction other than termination will be appropriate. Is that your argument? Only, only if the officer is dishonest under oath or where he has a, he has a duty of honesty. When you're, when you're, every time you write a ticket, you're, you're essentially swearing out a complaint. I am not seeking such a rule if the boss says, why are you, why are you a half hour late for work? And he says, well, there was a, the train, the train kept me any, any overslept. That's not what we're looking for here, but we're looking for cases. I'm looking at a case where officers were obligated to report to their superiors, obligated to take particular actions. And they failed to do that. And they're dishonest about it, either by acts of commission, as we demonstrate in the club 183 case or in a dishonesty by omission, which your honor gets me back to your question regarding the Barfield incident. That Mr. Barfield was ordered by the chief. I strike that Mr. Charles was ordered by the chief regarding the Barfield escape incident. Please reply with a detailed account of events. Explanation of the circumstances leading up to prisoner Barfield managing to exit the building, et cetera, et cetera. That is the type of unambiguous order by the boss that, that directs the police officer to say what happened? Well, boss, you know what happened? I screwed up. It's not the screw up. It's the dishonesty. That's where, that's why I keep coming down on this matter that under these very narrow circumstances, only police officers and only police officers who are dishonest under circumstances where they are compelled to be honest. That's a, that's a narrow, narrow exception. I'm arguing for consistent, consistent with all the case law and consistent with, with the public policy. That's what we want. We want. Maybe you need to define the public policy that you think is involved here. Is it, is it a more narrow than our general understanding that police officers need to exercise the utmost. You need to narrow the public policy or accept that general narrow for purposes of this case, I believe the public policy should be narrow to police officer. Honesty is an absolute. And your honor, if I can use that phrase, absolute. Okay. Under circumstances where the police officer is under oath to tell the truth or ordered by his boss under oath to tell the truth. I'm not sure if everybody's aware of the so-called Garrity rule that under a Supreme court case called Garrity. If a police officer is ordered to an interrogation, nothing that officer says during the interrogation can be used against him criminally because he's being compelled to testify. The flip side of the Garrity rule is that if he is dishonest in the interrogation, that dishonesty is cause for termination in and of itself, regardless of whether the officer engaged in any violation concerning the underlying incident. That's the narrowness I'm looking for in this case, not the, not the stray late for work. And, and I think that is a workable standard. And I think it is a standard that all sides would welcome. And so I would encourage you to give consideration to it. I have another question. And forgive me if this was in the record and I didn't see it, but the question of what Mr. Charles actually wrote as his response when, when asked because your opponents claim that he gave an account and the fact that some things were admitted was. It was an ambiguous kind of standard in terms of, did he intentionally admit it or what, or did they give him a chance to fix it and then he still admitted it. And that's what I, I think that that's what I understood them to say that you are keep your focusing on that as a lie, but the officer did not intend to lie he basically wrote a narrative that he thought answered the question. And I don't know, I don't know that I've seen the narrative that he wrote, but that's, if that's the case, you know, the arbitrator got a chance to hear all of this and he had an opportunity to get the explanations from both, both lawyers who, and all of you seem very capable. Why is it that you're asking us to impose our credibility finding, if you will, over what the arbitrator did. I, that's, it sounds to me like that's what you're asking us to do a few responses there the, the narrative was given before it was disclosed to Mr. Barfield that there was video. Secondly, secondly, it is to use, I think a phrase your honor, your honor used in response to Mr. Charles's argument, it's semantics. It is inconceivable that somebody would omit the most important aspect of the entire encounter. When he remembered as I, as I read during my opening argument, he knew what happened. He knew what happened. And the arbitrator actually found that he found that Mr. Mr. Charles's responses were self-serving and, and he didn't use the word dishonest, but we're not honest. So it's not a stretch when you, when you're ordered to give a statement as to what happened, you know, if he's like to give an extreme example, well, what happened to this, what happened to this guy? Well, I found him on the ground and then I called 9-1-1 and he, and he omits, oh, by the way, I shot him. You have an obligation to tell the boss what happened, how you screwed up and when you screwed up, when you know, you screwed up. This wasn't a case where he didn't know that he left the door open. He admitted it. Yes. I left the door open. So it's a very narrow set of circumstances that I think were presented here and it does not involve anything other than looking at the objective documents and the objective evidence and Mr. Charles's own admissions as justice, the Lord said, I'm not going to repeat the entire litany of, of what I consider to be a dishonest responses by this individual, but they're there. Two final points question about whether Mr. Charles knew that he was supposed to be at the club that night. The undisputed testimony from the shift supervisor, Mr. Pittman, who did testify at the arbitration said, Hey fellas, we got the club tonight. Now, just like, uh, police officers don't always talk into from memos, uh, when the boss says we got the club tonight, everybody knows what that means. Second, I guess this, my client was, uh, uh, taken to task for leaving Mr. Charles on the job for a few months before wrapping up the investigation and making the termination decision. You know, we, we have this little thing called the due process clause that we were attempting to observe and not, not making a termination decision prior to giving two separate notices of interrogation and two separate interrogation scheduling them with his union representatives. So I don't believe, I don't believe there's any fault to be found.  I don't even think it's relevant to the issue in this case regarding the timing of the interrogation. The finally, uh, Mr. Charles, both in his interrogation and in his testimony at the arbitration acknowledged that he was at the location of the nursing home. And this court can take judicial notice of Google mapping 183rd Laverne country club Hills, Illinois, and the court will see just exactly where Mr. Uh, Charles was positioned with the vehicle engine off lights off engaged in no police activity. And I really thank the court for, for the opportunity to flesh out my theory of the case. Thank you. Are there any other questions from the panel? No questions. Hearing none, then we'll take the matter under advisement and I'll ask Mr. Schaefer to remove the attorneys from the argument room.